## IN THE MATTER OF AN ARBITRATION
### BETWEEN

JOHNS MANVILLE

        The Employer,

and

INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, LOCAL 20

        The Union

CASE NO. FMCS 120221-53512-6
ARBITRATOR: Jerry B. Sellman
DECISION DATED: Oct. 18, 2012
GRIEVANT: Joseph Glover

## APPEARANCES

**FOR THE EMPLOYER:**

Stephanie Sue Padilla, Esq. - Attorney with Johns Manville, representing Johns Manville
Dan Payne – Direct Melt Supervisor for Johns Manville, Witness
Jonathan Cannon – Quality Control Process Auditor for Johns Manville, Witness
David Scheub – Shift Leader for Johns Manville, Witness
Gail Threet – Regional H.R. Manager for Johns Manville, Witness

**FOR THE UNION:**

John M. Roca, Esq. – Attorney with GALLON, TAKACS, BOISSONEAULT & SCHAFFER
    CO., L.P.A., representing the Union and Grievant
Renee Vierling – Machine Attendant for Johns Manville, Witness
Vonda Boyd – Machine Attendant for Johns Manville, Witness
Paul Konwinski – Chief Steward for Teamsters Local 20, Witness
Joe Glover – HP Operator for Johns Manville, Witness, Grievant

I.      **NATURE OF THE CASE**

Just cause for Discharge: Falsification of Records.  This matter came for hearing before

Arbitrator Jerry B. Sellman on September 6, 2012. The hearing was held in a conference room at

the Maumee Courtyard Marriott in Maumee, Ohio. The proceeding arises pursuant to the

provisions of the Collective Bargaining Agreement (the "Agreement") between Johns Manville

(hereinafter the "Employer," or the "Company") and International Brotherhood of Teamsters

Local 20 (hereinafter the "Union").  This case concerns a grievance filed by Mr. Joseph Glover

(hereinafter "Grievant") on January 31, 2012. The Grievant alleges that the Employer did not

have just cause to terminate his employment for incorrectly pulling skeins of glass fiber to be

used as samples for calculating production "melt rates" of glass fibers and for recording incorrect

package weights of glass fiber products. He admitted that he engaged in the conduct charged, but

argues that the penalty of discharge is a penalty too severe for the violations of Company

policies, rules and procedures. The Employer argues that the Grievant purposefully falsified

Company records in recording incorrect glass fiber product weights, which action alone is

subject to immediate termination. When this action is coupled with the multiple occasions of

incorrectly pulling skeins of glass fiber to be used as samples for calculating production "melt

rates" of glass fibers it has just cause to terminate his employment.

At the beginning of the hearing, the Parties stipulated that the matter was properly before

the Arbitrator for resolution. At the conclusion of the hearing, the parties requested permission to

file post-hearing briefs. The Arbitrator granted permission to file briefs, which briefs were filed

on October 12, 2012.

The issue in this proceeding is as follows:

(1)     Was the Grievant terminated arbitrarily and without just cause in violation of the collective bargaining agreement?

The applicable provisions of the Agreement in this proceeding are as follows:

## ARTICLE XXVII
## RIGHTS OF MANAGEMENT

124.    The Union hereby recognizes that the Company retains the sole and exclusive right to manage the affairs of the business and direct the working force. Such authority of management shall include, but is not limited to the unilateral: …(f) right to maintain discipline among employees including the right to make reasonable rules, regulations, or policies to promote efficiency, safe practices, and proper conduct; and (g) right to discipline or discharge employees for just cause.

## STIPULATION OF UNDERSTANDING
## Addendum No. 1
## DISCIPLINARY GUIDELINES

Rule or policy violations of a more severe nature such as, but not limited to, safety violations, possession of firearms, assault, possession of drugs or alcohol, contamination of products, insubordination and misappropriation or destruction of company property will subject the employee to suspension/discharge for the first offense.

Johns Manville reserves the right to determine the severity of those infractions, which warrant progressive discipline, and those which are subject to discharge or suspension for the first offense.

## ARITCLE V
## RULES OF CONDUCT

Refusal or failure to comply with the Company rules may be cause for disciplinary action up to and including discharge of an employee for such violations.

## ARTICLE XV
## SETTLEMENT OF DISPUTES

84.    Matters of wages production standards and job evaluation shall not be subject to submission to the arbitration

procedure established herein. Jurisdiction of the arbitrator is limited to:

(d)     Reversing the decision of the Company in matters involving the fairness of discipline, discharge or change of status of an employee, only if it is found that the Company has acted arbitrarily and without just cause or in violation of this Agreement.

## II.     SUMMARY OF THE TESTIMONY AND POSITION OF THE PARTIES

Johns Manville Waterville Plant makes direct melt fiberglass-based products including wet chop glass fibers primarily for specialty applications, glass reinforcements for gypsum wall boards, direct dry chop for plastic reinforcements, single end roving for weavers and plastic reinforcements, and glass mat.  The Grievant, Joe Glover, worked as an HP Operator. He started his employment with the Company in July, 2000. As part of his duties, the Grievant was responsible for pulling material (skein samples) for melt rates and for weighing packages of product and ensuring that information was entered correctly.

Direct Melt Supervisor Dan Payne described the manufacturing process and the relevant tasks performed by HP Operators.  Mr. Payne described the tasks related to obtaining material for melt rates.  He described how fiber is extruded through each of ten bushings on a production line and is transported to a chopper.  Skein samples are cut from fiber coming out of the bushings and placed on a clipboard so that measurements can be made to determine the number of pounds of glass fiber that is coming out of the bushings per hour and the micron size of the material. It is important that the samples are properly taken from the bushings pursuant to Company policy so that a correct melt rate measurement can be taken. In the production process, melt rates must conform to certain specifications in both size and weight with small latitude for prescribed variances. Measurements from the melt rates indicate the diameter of the product, which must be

in line with customer specifications The diameter of the product is also indicative of the ultimate price of the product. As an example, melt rates will determine if the product being produced is the size of 16 microns, 13 microns or 10 microns. Each size has a different pricing.

In order to ensure that the product is being produced to the specifications for the run and the requirements of the customer, HP Operators are required to take several samples of the fiber each shift and provide those on a clip board for testing. Adjustments to the run are then made as necessary according to the results of the melt rate. If the samples are not correctly taken, problems in production occur, which problems include rerunning the batch or stopping production.

Hourly union worker, John Cannon, who testified under subpoena, indicated that on January 16, 2012, he obtained samples from the Grievant and ran the melt rate testing.  He noticed that the melt rates for the samples pulled by the Grievant were significantly out of specification. The normal protocol requires that if the testing results are out of specification, the tests are performed again.  Accordingly, Mr. Cannon asked the Grievant to pull the samples again. When he tested these new samples, the results were not improved.

Evidence indicates that the melt rates calculated from the Grievant's samples were so far off it was obvious that the sample was not properly taken. Calculations should have been in a range no higher than 240, but they were at 559. With a sample rate of 559, the temperature of the bushing would have had to have been double the prescribed production temperature, which would be virtually impossible.  If the melt rate calculations would have been 235 or 245, a variance of 5 to 10, the calculations would have been within acceptable variations of production specifications. A variance of three hundred is not possible. The samples had to have been incorrectly taken. There was no production explanation for the variance.  After the second set of

melt rates again came back impossibly high, Mr. Cannon had no choice but to report the issue to management.

Mr. Payne testified regarding another task of the HP Operator – weighing packages of glass fiber.  Mr. Payne stated that a single worker generally rotates assignments by shift.  An HP Operator is assigned the tasks of monitoring the bushings and taking the melt rates generally for a shift.  On an HP Operator's next shift, he or she might be assigned to work downstairs weighing and moving the packages.  An HP Operator would not be responsible for performing both the upstairs duties (monitoring the extrusion, chopping and sampling process) and the downstairs duties (taking rolls of glass fiber and weighing them) simultaneously.

Melt rates are taken upstairs at the plant. In the downstairs area, the machine winds the packages of product and the HP Operator cuts, labels and weighs the package and then places it on the conveyor. Each package of wound fiber is placed on a scale, the leg that it comes from is entered into the computer and the weight is recorded.  The information is sent by computer upstairs to another operator, who is in charge of monitoring the data and making any adjustments necessary to the process to ensure that product stays within specifications of the customer.

On the night of January 16-17, 2012, Union hourly worker, Dave Scheub, who testified under subpoena, was working as the hourly shift lead.  In monitoring the package weights, he noticed that the readings seemed incorrect. Package weights for packages reportedly coming off of different legs, which were only seconds apart, were identical.  It would be virtually impossible for an operator to take a package out of the doors of a leg, take it to the scale, weigh it, put it on the conveyer and get the next package from the next door to the scale and weigh it within just a few seconds. Moreover, it would be extremely unlikely that the weights of two different packages coming from different legs would be exactly the same.  Accordingly, it did not seem

that the readings could be correct. This made it virtually impossible for Mr. Scheub to make any adjustments as he had no confidence that the readings were correct so, according to Company policy, he reported the issue to management.

Gail Threet, the Company's Regional Human Resources Manager, received information regarding the melt rate incident on January 16, 2012, and information regarding the package weight incident on January 17, 2012. The Company decided to conduct a further investigation. After further investigation, it was discovered that the Grievant had on January 18, 2012, engaged in entering incorrect weight information in a similar fashion as discovered on January 17, 2012.

Based upon the information before it, the Grievant was suspended pending further investigation and evaluation. Evidence revealed that the Grievant worked the 16th, 17th, and 18th of January, was off on the 19th and 20th, and had a vacation day on the 21st. He was suspended with pay pending investigation on his first day back after the 18th, on January 22nd. The HR department took over the investigation.

The Company's Regional Human Resources Manager conducted the investigation. She reviewed the data provided by Company management and the Grievant. With respect to the issue regarding the melt rates, she concluded that the melt rate samples were likely pulled incorrectly. In light of the fact that the Grievant had previously refused training on properly pulling the sample skeins, she felt that a verbal warning would be appropriate as discipline for what appeared to be a mistake caused by lack of training or misunderstanding of the process.

With respect to the way the Grievant entered the weights of the packages, she carefully considered the statements made by the Grievant. In the investigation, the Grievant admitted that he had been trained the "right way" with respect to how to take the weights. He admitted that he had placed a single package on the scale and then entered different leg numbers (other than the

correct leg number) so that the same package was weighed and falsely represented as being from each of the different legs, rather than actually weighing each package from each of the different legs.  The Grievant was able to articulate the correct way to take the weights.  The Grievant described his actions as deliberate and not due to a lack of training or mistake.  He offered no excuse except that he had been upset due to a situation with his wife and son and that he needed to "get his head together" and "needed some chair time."  Ms. Threet concluded that the Grievant falsified this data because he did not want to take the time to do his job correctly.

The Grievant had been disciplined by the Company on a few occasions since the commencement of his employment in 2000. In January 2001, the Grievant received counseling as discipline for excessive absenteeism. In February 2001, he was again counseled for a separate company violation. In July 2001, he was disciplined for not properly locking out the robot, but the level of discipline was not indicated.  In August 2006, he was given a written warning for not following lockout procedures on the robot.

At the arbitration hearing, the Grievant provided testimony virtually identical to what he had provided during the investigation.  The Grievant testified that he had been given training on the correct process for taking the weights of the packages.  He stated he purposefully entered the incorrect weights.  He indicated that he had a lot on his mind and wanted to sit.  However, when pressed as to what was going on personally that day, the Grievant offered only that he had been having a normal marital discussion with his wife concerning his wife's opinion that he should be more patient with his hyper son.  The Grievant indicated that he knew what he did was wrong (in knowingly entering the false weights), and that he would "accept my punishment."

The Company's Regional HR Manager determined that Grievant had committed very serious offenses, in knowingly and purposefully providing incorrect information for company

records not just on one shift, but on two. She found the offenses to merit discharge and not progressive discipline. She testified that the Company considers falsification of data an extremely serious offense. The Company expects that all employees will perform their jobs accurately and honestly. The Company considers integrity to be one of the six pillars of its operations. She could not recall an incident she described "as severe and blatant" as the conduct of the Grievant in the last five years at the Waterville plant.

Ms. Threet testified that whenever serious incidents occur at the plant, employees were terminated on the first offense. There was no evidence offered that any employee who had been found after an investigation to engage in similar conduct had been treated any more favorably. There was, however, no incidence(s) revealed that mirrored the exact conduct of the Grievant in this case. Although Ms. Threet considered the Grievant's length of employment and his prior work history in making her final decision, she did not find either to provide any basis for mitigating the discipline of discharge. The fact that the Grievant had prior discipline for two serious safety violations was evidence that he had been placed on notice that further violations could result in discipline including discharge. The fact that the Grievant had recently refused training to address the melt rate issue indicated that the Grievant was not likely a good candidate for rehabilitation. Accordingly, there being no dispute that the offense occurred and no evidence of any mitigating factors, she made the decision to terminate the Grievant's employment.

The Grievant testified that during the month of January, 2012, he was undergoing severe stress as a result of a myriad of family issues at home. At that time, he and his wife were on the verge of divorce and he was under a great deal of personal anxiety. In addition, his son suffers from attention deficit disorder. This routinely manifests itself in disruptions in both the classroom and at home. These issues came to a head on the night of January 16, 2012.

While on break, the Grievant received a phone call from his wife. He was told that his son had recently been disciplined at school. During this phone call, the Grievant's wife became angry at him, aggravating their already precarious relationship. The Grievant testified that he became completely overwhelmed at the thought of a divorce from his wife and the continual discipline issues with his son. As a result, he made three mistakes.

On January 16, 2012, the Grievant's frustrations led to issues with his melt rate checks. When he went home for the evening, he found his problems waiting for him causing his frustrations to continue over the next forty-eight hours. As a result, he twice entered the wrong information for his package weights. The Grievant testified that at no point has he ever attempted to evade, mislead or otherwise omit information provided to the Company regarding the issues which brought him to his current situation.

Position of the Employer

The Employer argues that it clearly had just cause to terminate the employment of the Grievant for falsification of Company records. The Company believes it has established through clear and convincing evidence that the Grievant violated its policies against falsification of company records. The Grievant knowingly entered incorrect package weights multiple times during two separate shifts on January 17th and January 18th. The temporal proximity of the readings and the identical nature of the weights recorded would have been virtually impossible to obtain had the task of taking the weights been correctly performed by the Grievant. Most importantly, the Grievant admitted during the investigation conducted by the Company and again during the arbitration proceedings that he purposely entered the incorrect weights. The Grievant testified that he knew his conduct was wrong and that he could be punished for it. There is no dispute as to the Grievant's guilt.

The Company conducted a fair and objective investigation.  There is no evidence that the Grievant had been unfairly targeted for investigation or discipline; that his supervisor or the Regional HR Manager discriminated against him; or that the evidence used to substantiate his guilt was improperly obtained or processed.  The initial information about the violation involving the melt rates and violation involving the weights was reported by two different hourly workers, fellow union employees, who were unable to perform their jobs with the incorrect information provided. Witnesses concerning the incidences were interviewed and the Grievant was provided ample opportunity to present evidence in his defense.

The prohibition against falsification of company records is reasonable and rationally related to efficient operations of the Company. Every employer has a legitimate expectation that its employees will conduct themselves honestly and that the employer can rely on reports and records they generate. Arbitrators have routinely held that employers are justified in imposing severe penalties for serious first time offenses.

Here, the Collective Bargaining Agreement specifically provides management with the right to determine which violations do not require progressive discipline and will subject an employee to summary discharge. Under the mutually agreed Disciplinary Guidelines, the parties agreed that "Rule or policy violations of a more severe nature such as, but not limited to, safety violations, possession of firearms, assault, possession of drugs or alcohol, contamination of products, insubordination and misappropriation or destruction of company property will subject the employee to suspension/discharge for the first offense." The Company reserved the right to determine the severity of which infractions warrant progressive discipline, and those which are subject to discharge or suspension for the first offense.

The uncontroverted testimony of the Company's Regional HR Manager provided that management has deemed the falsification of company records to be one of the severe violations, which warrants immediate termination. Arbitrators have recognized that falsification of company records is universally regarded as a dischargeable offense. The Regional HR Manager testified that she was not aware of an instance across the company, including salaried or hourly employees, where an employee found after an investigation to have committed such a violation was given any different type of discipline. The Union did not rebut this testimony with any admissible and credible evidence. There is no evidence that Johns Manville has acted disparately or arbitrarily.

The Collective Bargaining Agreement empowers an arbitrator to reverse the decision of the company "only if it is found that the Company has acted arbitrarily and without just cause or in violation of this Agreement." To uphold the grievance by finding the Grievant guilty, but reducing the discipline, the Arbitrator would be adding language to the contract requiring progressive discipline which would be inconsistent with the plain language of the contract and beyond the Arbitrator's authority.

<u>The Position of the Union</u>

The Union argues that the Employer did not have just cause to terminate the Grievant for several reasons: (1) the Employer did not follow the principles of progressive discipline for it consolidated all three corrective disciplinary notices and delivered them at the same time on the same day; (2) the offense of entering incorrect weights is not an immediately terminable offense as advocated by the Employer; and (3) the penalty is too severe when considered in light of the offense(s) and the state of the Grievant's mind at the time the offenses were committed.

Progressive discipline requires various gradual steps which exist to serve as a warning that continued violations will result in termination of employment. See, *Little Rock Baptist Christian Center*, 124 LA (BNA) 470 (Allen, 2006). In *Professional Med Team Inc.,* 111 LA (BNA) 457, 461 (Daniel, 1988) Arbitrator Daniel stated: "It is expected that the individual aspects of misconduct will be called to an employee's attention and he will be informed of what is expected of him in the future. The penalty should then increase as he fails to respond." Here, the Grievant had no warning, notice, or opportunity to remedy his behavior prior to his termination. All three violations were presented to the Grievant on the same day and there was no "progression" in the penalty given to the Grievant. The Company made no attempt to notify the Grievant of his misconduct nor did it attempt to warn the Grievant of a potential termination for further infractions.

The Company never provided any notice that incorrectly inputting quality control information would result in immediate termination. While Company representatives testified that "in their opinion" this conduct was considered "falsification of records" and subject to termination, that position is only supported by testimony and no other evidentiary documentation. Allegations or assertions are not proof, and mere allegations unsupported by evidence are given no weight in arbitrations, particularly when the issue concerns discharge. See, Elkouri & Elkouri, *How Arbitration Works*, 6th Edition, p. 422. 2003). See also, *Pacific Southwest Airlines,* 74 LA 64, 68 (Rule, 1980).

The Union offered testimony of two other union employees, who stated that on several occasions they were directed by the Company to input incorrect quality control numbers. The Arbitrator ruled that the testimony was irrelevant and inadmissible because the employees did not work in the same department as the Grievant and were not involved in the same type of

infractions that subjected the Grievant to discipline. This testimony was not proffered to justify the conduct of the Grievant, but to demonstrate that the level of the infraction was less than that indicated by the Company. The Union believes that the conduct to which these witnesses testified demonstrates that the Company permitted the falsification of quality control checks and therefore it is less probable that the Grievant's acts were so reprehensible that they warrant summary discharge.

The Company and the Union agreed to administer discipline in a progressive manner. Any action by the Company to skip the steps of progressive discipline and discharge an employee without notice should be used only in the case of extremely serious offenses such as sleeping on duty or theft or failure to report an accident and serious safety issues. The Grievant did not engage in any such serious conduct and should be given an opportunity to be treated under the progressive disciplinary guidelines of the Company. His case is similar to that in *In re Sterling Chemicals Inc.*, 119 LA (BNA) 171 (Goodman, 2002).

In *Sterling*, the grievant was discharged for falsifying a load report for a rail car carrying toxic chemicals. The grievant had completed the load report indicating that the rail car had passed all inspection points. However, that rail car had in fact deteriorated to unsafe levels and should not have passed inspection. Nonetheless, the arbitrator determined but for the grievant's last chance agreement, discharge would not have been appropriate. In *Sterling*, the Company was a manufacturer of toxic chemicals.  The Company processed the chemicals and then shipped them by rail car across the United States.  The grievant was employed as a pumper gauger. His responsibilities included inspecting the rail cars to ensure inspection points were met and then loading the rail cars with chemicals.  The rail cars were not to be loaded until the safety inspection points were met.

On the day at issue, the grievant discovered a rail car which had deteriorated past the Company's safety requirements.  Instead of sending the rail car for repair, the grievant falsified the load report and filled the rail car with acetic acid. The Company argued that the grievant's falsification of load report could have caused serious health risks and government sanctions for shipping an unsealed container of toxic chemicals across the Country. Conversely, the grievant and his union argued that the grievant had merely committed a clerical error. Ultimately, the arbitrator held that under the progressive discipline policy an appropriate penalty should have been a final reprimand; as this was not a situation which warranted summary discharge. However, the grievant was already subject to a last chance agreement and the arbitrator determined that it seemed unreasonable to assess two final reprimands. While the facts in *Sterling* are quite similar to the Grievant's situation, the potential repercussions in *Sterling* are vastly different. The Grievant's erroneous QC checks did not create any potential safety hazards or government sanctions. It is also conclusively established that these faulty QC checks were remedied prior to shipment. Moreover, this is a first time offense with respect to the Grievant's QC checks. Accordingly, he should be afforded his rights to progressive discipline and reinstated with a lesser penalty.

III.    **DISCUSSION AND OPINION**

The issue before the Arbitrator is whether the Employer has just cause to terminate the Grievant.

The burden of proof in demonstrating just cause for discipline rests upon the Employer. In cases of termination, this Arbitrator has held on many occasions that the burden of proof is met only upon a demonstration of clear and convincing evidence.  To that degree, it is incumbent upon the Employer in this case, at a minimum, to demonstrate through clear and convincing

evidence that the Grievant committed the infractions for which he is charged, and that the discipline meted out by the Employer was for just cause.

In order to establish that the "just cause" standard of review has been followed, a number of tests have been used by arbitrators in the past.  Commonly accepted tests were derived from one of Arbitrator Carroll R. Daugherty's cases[1] years ago and included the following:

1.    The employee must have been given advance warning of the possible or probable disciplinary consequences of his or her conduct.

2.    The rule or order the employee violated must be reasonably related to the efficient and safe operation of the business or agency.

3.    They must have made an effort to discover whether the employee did, in fact, violate the rule.

4.    The employer's investigation must have been conducted fairly and objectively.

5.    There must be substantial evidence of the employee's guilt.

6.    The employer must have applied its rules, orders, and penalties without wrongful discrimination.

7.    The penalty must be reasonably related to the seriousness of the employee's offense and record of past service.

Based upon an examination of the facts in this proceeding in light of the above criteria, it is the Arbitrator's opinion that the Employer did have just cause to discipline the Grievant, but not terminate his employment.

Little analysis is needed to determine whether most of the standard tests for determining just cause for discipline in this case have been met. The Employer has demonstrated that the establishment of company procedures requiring the proper processing of glass fiber products and accurately recording quality control information is reasonably related to the efficient and safe operation of the business. The Grievant was aware of the Company's policies on properly pulling

---

[1] *Enterprise Wire Co. and Enterprise Independent Union* issued March 28,1966 (46 LA 359).

material to determine a melt rate and properly weighing finished product. The Grievant violated the Company's policies when he did not properly take skein samples for melt rate calculations and violated Company policies when he purposefully provided incorrect data on product weights. The Company conducted an investigation wherein it interviewed witnesses aware of the events leading up to the Grievant's discipline and it gave the Grievant an opportunity to respond to the allegations. He admitted engaging in the charged misconduct.

The only remaining analysis is to consider whether the Company has acted arbitrarily and without just cause or in violation of this Agreement in discharging the Grievant.  After reviewing all of the evidence and the arguments presented by the parties, the Arbitrator must conclude that the Employer did act arbitrarily and without just cause in discharging the Grievant.

The evidence does not support a conclusion that the conduct of the Grievant was equivalent to the more egregious conduct as identified in the Collective Bargaining Agreement that would subject the employee to suspension/discharge for the first offense. The misconduct of the Grievant, under the circumstances presented at the hearing, does not rise to the level of safety violations, possession of firearms, assault, possession of drugs or alcohol, contamination of products, insubordination and misappropriation or destruction of company property. As such, the discipline of discharge was not within the bounds of progressive discipline as applied in the industrial community and considered to be a part of this collective bargaining agreement.

In regard to incorrectly pulling skeins of glass fiber to be used as samples for calculating production "melt rates" of glass fibers, even the Regional HR Manager agreed that this alone would not have been a dischargeable offense, albeit subject to some form of discipline such as a verbal warning. In fact, the Corrective Discipline Notice delivered to the Grievant on January 2, 2012, did designate a Verbal Warning for the offense.

The discipline of discharge in this case is problematic because of the method and timing of notice given to the Grievant, the inability of the Grievant to correct his conduct, the actual seriousness of the conduct and the overall disciplinary history of the Grievant.

Giving the Grievant notice of his violations of Company policies, rules and regulations at the same time, on the same day, without any separation between the events of misconduct, under the facts of this case, is not in the spirit or process of progressive discipline. Giving the Grievant a Verbal Warning for incorrectly pulling skeins of glass fiber on January 16, a Written Warning for falsifying a quality check on January 17, a Suspension for falsifying a quality check on January 18 and then a discharge for the combination of the three is arbitrary. These are three separate events, but two types of violations and totally different levels of seriousness. While under the proper circumstances a single notice could be sufficient to uphold an employer's position of discharge, the single notice of three violations here must, of course be taken in light of the seriousness of the offenses.

When a grievant is notified of misconduct, he or she must be given an opportunity to correct the conduct with warning of further discipline up to and including discharge. As pointed out by the Union, after notice and discipline, an employee should be informed of what is expected of him in the future. The penalty should then increase as he fails to respond. Here the Grievant was essentially informed of his misconduct and terminated. The Employer argued that it was unlikely that the Grievant was a good candidate for rehabilitation under a progressive discipline system. Based upon the nature of the Grievant's misconduct, such a conclusion is unfounded. Training can correct the act of incorrectly taking skein samples; warning of termination should correct the act of trying to shortcut the Company's quality control procedures.

The primary reason for the penalty of discharge was based upon the Employer's determination that the failure to properly weigh and record glass fiber packages constituted falsification of company records. To that end, the Employer considered the conduct to be an absolute breach of trust and one in which an essential element of the employment relationship is violated. Under proper circumstances, this Arbitrator has upheld a discharge where the breach of trust was so significant that it warranted discharge. I agree that the conduct of the Grievant in failing to weigh all of the packages and merely duplicating weights did violate quality control requirements and was a serious infraction, but it did not warrant discharge in this case.

As a general rule, an arbitrator's role in a disciplinary proceeding is limited to determining whether the Employer, in forming its judgment, acted in good faith and upon a reasonable basis. If it did, the Arbitrator may not substitute his judgment for that of the Employer even if he might have reached a different conclusion regarding the termination. As stated in *Airfoil Forging Textron,* 106 LA 945 (Klein, 1996), citing *Stockholm Pipe and Fittings,* 1 LA 160 (McCoy, 1995), " [I]t should be pointed out that the initial determination of the appropriate penalty is primarily the function of Management and that only when the Company's determination can be deemed to be arbitrary, capricious, discriminatory, unreasonable or made in bad faith is an arbitrator justified in interfering with the Company's determination by concluding that the Company abused its discretion in meting out the discharge penalty." At page 950. Generally, arbitrators will not modify the penalty imposed by an employer unless it bears no reasonable relationship to the offense committed. *City of Racine,* 78 LA 627, 629-30 (McCrary, 1982).

While the conduct of the Grievant can be considered "serious misconduct," under the facts and circumstances presented herein, he is entitled to receive discipline in a progressive and

uniform manner. It appears to the Arbitrator that the Grievant's conduct was attributable more to laziness than a purposeful intention to harm the company. One cannot determine if the Grievant's conduct was a result of professed personal problems on the days in question, but given the benefit of the doubt, it may have at least contributed to the problem. The incorrect pulling of skeins of glass fiber appears to be a first time offense occurring on the same day. The improper weighing of finished glass fiber product had not occurred previously and did not appear to be maliciously motivated or reflective of a course of conduct. With these factors taken into consideration, discharge is unreasonable and arbitrary.

While the Union attempted to introduce testimony of other employees that indicated management acquiesced to improper recordation of quality control information and that the practice was therefore accepted, the Arbitrator excluded the testimony as unreliable, irrelevant and improper. Not only were the alleged incidences in other departments involving different managers and different processes, the Employer has an anonymous hotline for reporting violations of company policy and lack of upper level management knowledge of these unacceptable practices would bring suspicion upon this testimony, even if considered. Further, the Arbitrator could not conclude from the testimony the level of quality control variances that were or were not permitted in the other departments.

The Arbitrator also considered the Grievant's disciplinary record, which was admitted into evidence over the objection of the Union. The discipline received by the Grievant in the past was so sporadic and for such unrelated conduct that it was considered to have little bearing on the consideration of the discipline in this case, particularly for a twelve-year employee.

In the final analysis, the Grievant should be suspended for his conduct, but not discharged. There is no excuse for purposefully entering improper data into the Employer's

quality control process. If he chooses to be inattentive or lazy in performing his duties at the plant in the future, the Employer would be justified in terminating the employment relationship.

## IV.    <u>AWARD</u>

For the foregoing reasons and conclusions, the Grievance is sustained in part and denied in part. The Grievance is denied to the extent that the Employer did have just cause to discipline the Grievant for his conduct. It is sustained in that the penalty of termination is unreasonable under the facts and circumstances herein demonstrated, and the discipline is hereby reduced to a five-day suspension. The Employer is hereby ordered to restore the Grievant to his classification and make him whole for any loss of wages or benefits as a result of the improper termination, less the five-day suspension served.

Jerry B. Sellman, Arbitrator